UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RYAN SLOWEY,

                         Plaintiff,

        -against-

SAINT-GOBAIN PERFORMANCE PLASTICS
CORPORATION, SAINT-GOBAIN CORPORATION
HONEYWELL INTERNATIONAL, INC. f/k/a ALLIED-
SIGNAL INC., 3M COMPANY, E.I. DUPONT DE
NEMOURS AND COMPANY, and THE CHEMOURS
COMPANY,

                         Defendants.

**COMPLAINT**

**DEMAND FOR JURY
TRIAL**

Case No. 1:19-CV-0216 (LEK/DJS)

Plaintiff, by and through his attorneys, Nolan & Heller, LLP, as and for his Complaint against

Defendants, alleges as follows:

## INTRODUCTION

1.      Defendant Saint-Gobain Performance Plastics Corporation ("SGPP") is the owner

and operator of two manufacturing facilities in the Village of Hoosick Falls, New York, located at

14 McCaffrey Street, Hoosick Falls, New York (the "McCaffrey Street Facility"), and 1 Liberty

Street, Hoosick Falls New York (the "Liberty Street Facility" and collectively with the McCaffrey

Street Facility, the "Hoosick Facilities"), respectively.

2.      Defendant Saint-Gobain Corporation ("Saint-Gobain") is the parent corporation of

SGPP and, upon information and belief, at all relevant times was actively involved in the

management of, and decision-making by, SGPP, including issues relating to environmental health

and safety.

3.      At all times relevant hereto, Saint-Gobain has control and management authority over

SGPP with respect to the use, management, handling and disposal of hazardous or toxic substances

1

and wastes by SGPP.

4.     SGPP processed fluoropolymers at the Hoosick Facilities that were made with perfluorooctanoic acid ("PFOA").

5.     Defendant Honeywell International Inc. ("Honeywell", and, collectively with SGPP and Saint-Gobain, "Facility Owners") is a past owner and operator of the Hoosick Facilities.

6.     During its period of ownership and operation of the Hoosick Facilities, Honeywell also processed fluoropolymers at the Hoosick Facilities that were made with PFOA.

7.     Defendants 3M Company ("3M") and E.I. DuPont De Nemours and Company ("DuPont") developed, manufactured, distributed and/or sold PFOA-containing materials to Saint-Gobain, SGPP, and Honeywell that were used at the Hoosick Facilities.

8.     As a result of Defendants' operations involving the distribution and use of PFOA and/or PFOA-containing materials, PFOA has been discharged, released or otherwise disposed of from the Hoosick Facilities into the air, ground, and water in, and around, the Village of Hoosick Falls (the "Village").   As a result of the Facility Owners' actions, PFOA has contaminated the drinking water supply of the Village.  PFOA is also present in the soils and groundwater at locations throughout the Village and in areas adjacent to the Village.

9.     As a result of the PFOA contamination in the water, air, soils, and groundwater in, and around, the Village, Plaintiff, as a former resident of the Village was exposed to PFOA throughout the 14 years in which he resided there.

10.     Exposure to PFOA can cause numerous and serious health effects, including a variety of cancers such as kidney cancer, testicular cancer, and pancreatic cancer.  PFOA exposure is also known to cause ulcerative colitis, thyroid disease, high cholesterol, pregnancy induced hypertension, and other ailments.

11.     The Facility Owners' contamination of the Village water supply and environment has resulted in a significant number of individuals, including Plaintiff Ryan Slowey, suffering from severe impairments of their health.

12.     Plaintiff Ryan Slowey brings this action against Defendants pursuant to New York common law to recover personal injury damages arising from his exposure to PFOA.

## PARTIES

### PLAINTIFF

13.     Plaintiff Ryan Slowey ("Plaintiff" or "Mr. Slowey") is a citizen and resident of the City of Albany, New York, residing at 476 Yates Street, Albany, New York 12208.

14.     Plaintiff moved to Hoosick Falls in 1986 at the age of six, and resided at 65 Wilder Avenue (the "Slowey Residence") until 2000.

15.     The Slowey Residence was located within the Village and received its water from the Village's municipal water system.

16.     Mr. Slowey and his family used the Village water for, among other things, cooking, consumption, and bathing.

17.     During his residency in Hoosick Falls, Mr. Slowey was exposed to high levels of PFOA.

### DEFENDANTS

18.     Defendant SGPP is a company organized under the laws of the State of California with a principal executive office located at 20 Moores Road, Malvern Pennsylvania 19355, and is licensed and doing business in the State of New York.

19.     Defendant SGPP is a wholly owned subsidiary of Saint-Gobain Ceramics & Plastics, Inc., which is a subsidiary of Saint-Gobain Delaware Corporation, which is a subsidiary

3

of Defendant Saint-Gobain.

20.    Defendant Saint-Gobain is a company organized under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 20 Moores Road, Malvern, Pennsylvania 19355, and is licensed and doing business in the State of New York.

21.    Defendant SGPP has more than 4,000 employees, is present in 16 countries in North America, Europe and Asia, and operates 45 manufacturing sites.

22.    Defendant Honeywell, f/k/a Allied-Signal Inc., is a company organized under the laws of the State of Delaware with its principle executive office located at 115 Tabor Road, Morris Plains, New Jersey, and is licensed and doing business in the State of New York.

23.    Defendant Honeywell is a Fortune 100 company with a global workforce of approximately 130,000.

24.    Defendant Honeywell is the successor-in-interest to Allied-Signal, Inc. and Allied-Signal Laminate Systems, Inc. (collectively, "Allied-Signal").  Specifically, in or about 1999, Allied-Signal acquired the company then known as Honeywell, and subsequently changed its name to that of the company it acquired.  As used herein, Honeywell refers to both Honeywell and its predecessor-in-interest, Allied-Signal.

25.    In or about 1996, Furon Company ("Furon") acquired the Fluorglas division of Allied-Signal and thereby took ownership of the Hoosick Facilities.

26.    In 1999 SGPP acquired Furon, becoming its successor-in-interest, and, upon information and belief, as a result thereof assumed liability for all acts and omissions of Furon relative to the claims herein.  As used herein, SGPP refers to both SGPP and its predecessor-in-interest, Furon.

27.    Defendant3M is and was at all times relevant hereto a corporation organized under the laws of Minnesota with its principal executive office located at 3M Center Building 220-11W-

02, Saint Paul, Minnesota.

28.     3M manufactured and/or sold Polyfluorotetraethylene ("PTFE") products which contained PFOA to Saint-Gobain, SGPP, and Honeywell that were used at the Hoosick Facilities.

29.     Defendant DuPont is, and was at all times relevant hereto, a corporation organized under the laws of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware. DuPont is registered to do business as a foreign corporation in the State of New York.

30.     DuPont manufactured and/or sold PFOA-containing materials to Saint-Gobain, SGPP, and Honeywell that were used at the Hoosick Facilities.

31.     Defendant Chemours Company ("Chemours" and collectively with 3M and DuPont, the "PFOA Distributors" and collectively with 3M, DuPont, and the Facility Owners, "Defendants") is a corporation organized under the laws of Delaware with its principal place of business located at 1007 Market Street, Wilmington, Delaware. Chemours is registered to do business as a foreign corporation in the State of New York.

32.     Upon information and belief, Chemours is comprised of divisions or sectors of DuPont which made "performance chemicals", including Titanium Technologies, Chemical Solutions, Fluoroproducts.

33.     Upon information and belief, DuPont's "spin off" of its performance chemicals business into a company that would become Chemours was announced in or about October 2013, and was completed on or about July 1, 2015.

34.     Upon information and belief, as part of the spin off, Chemours assumed liabilities for DuPont's prior manufacturing of performance chemicals, including prior sales of PFOA-containing materials.

## JURISDICTION AND VENUE

35.     Jurisdiction is proper in this Court due to diversity of citizenship, pursuant to 28 U.S.C. § 1332(a), because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

36.     This Court has general and/or specific personal jurisdiction over Defendants because they either have committed tortious acts within the State of New York (the "state") and/or have committed tortious acts without the state that have caused injury to persons or property within the state, maintain a place of business in the state, carry on a continuous and systematic part of their general business within the state, derive substantial revenue from goods and services used or rendered in the state, and/or have transacted substantial business within the state or contracted to supply goods or services within the state—all of which has caused harm to Plaintiff.

37.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant SGPP conducts substantial business in this District, Plaintiff Ryan Slowey resides in this District, and a substantial part of the events or omissions giving rise to the instant claims occurred in this District.

## GENERAL FACTUAL ALLEGATIONS

### BACKGROUND REGARDING PFOA

38.     PFOA is a synthetic, man-made chemical not found in nature.

39.     PFOA is a fluorine-containing chemical that was used in the production of fluoropolymers such as PTFE.

40.     PFOA is also known as "C8" and "perfluorooctanoate" because its chemical structure contains eight carbon atoms.   Ammonium Perfluorooctanoate ("APFO"), also known as perfluorooctanoic acid ammonium salt, is, essentially, a formulation of PFOA in salt form.  APFO is, however, less stable than PFOA.  When APFO degrades, it forms PFOA.

41.     Additional   PFOA   synonyms   include   pentadecafluoro1-octanoic   acid,

6

pentadecafluoronoctanoic    acid,    pentadecaflurooctanoic    acid,    perfluorocaprylic    acid, perfluoroctanoic acid, perfluoroheptanecarboxylic acid and octanoic acid.

42.    3M was the original manufacturer of PFOA.

43.    PFOA is resistant to degradation by natural processes making it extremely persistent in the environment.

44.    Due to PFOA's very low volatility it is persistent in water and soil.

45.    PFOA migrates readily from soil to groundwater and migrates readily with groundwater.

46.    PFOA is also persistent in the human body and remains present long after a single exposure. Because of its persistence and stability, PFOA bioaccumulates in the human body, particularly upon repeated, or continuous, exposure.

47.    PTFE resins and aqueous dispersions containing PFOA were used in a number of commercial and industrial applications, including pressure sensitive tapes, stain resistant fabrics and carpets, and laminating wires, amongst other uses.

48.    Upon information and belief, 3M ceased all global production of PFOA in or about 2002.

49.    In 2006, as part of the Environmental Protection Agency's ("EPA") PFOA Stewardship Program, the eight major manufacturers and users of fluoropolymers agreed to cease the use of PFOA in the United States by December 31, 2015.

## HUMAN HEALTH RISKS CAUSED BY EXPOSURE TO
## PFOA AND RELATED CHEMICALS

50.    The human health risks caused by exposure to low levels of PFOA and related chemicals include several types of cancer, as well as immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol.

51.     The stable carbon-fluorine bonds within PFOA molecules cause PFOA and related chemicals to be highly resistant to environmental breakdown mechanisms.

52.      As a result, PFOA and related chemicals accumulate in soil, water, and air, and in biological systems, including humans and animals.

53.     PFOA is absorbed after consumption or inhalation, and bio-accumulates primarily in the bloodstream, liver and kidneys.

54.     PFOA has a half-life in humans ranging from 2 to 9 years, which results in continued, increasing exposure that could increase body burdens to levels that would result in adverse outcomes.

55.     Acute- and intermediate-duration oral studies on rodents have raised concerns about potential developmental, reproductive and other systemic effects of PFOA.

56.     PFOA has a high affinity for binding to B-lipoproteins and liver fatty acid-binding protein.  Several studies have shown that PFOA can interfere with fatty acid metabolism and may deregulate metabolism of lipids and lipoproteins.

57.     In May 2006, the EPA Science Advisory Board suggested that PFOA cancer data are consistent with the EPA guidelines for the Carcinogen Risk Assessment descriptor "likely to be carcinogenic to humans."

58.     EPA uses the descriptor "likely to be carcinogenic to humans" when the weight of the evidence is adequate to demonstrate carcinogenic potential to humans.

59.     Upon information and belief, PFOA is also linked to other serious non-cancer adverse health effects.

60.     The association of exposure to PFOA and related chemicals and certain cancers has been reported by the C8 Health Project, an independent Science Panel (the "C8 Science Panel") charged with reviewing the evidence linking PFOA-related chemicals to the risk of disease based on (1) health research of populations in the Ohio Valley that were exposed to those chemicals as a result

of releases from a DuPont chemical plant, and (2) a review of other published scientific research.

61.     Specifically, "the C8 Science Panel carried out exposure and health studies in the Mid-Ohio Valley communities, which had been potentially affected by the releases of PFOA (or C8) emitted since the 1950s from the Washington Works plant in Parkersburg, West Virginia. They then assessed the links between C8 exposure and a number of diseases." ("C8 Science Panel", Home Page *available at* http://www.c8sciencepanel.org/)

62.     The C8 Science Panel specifically found that high cholesterol, pregnancy induced hypertension, ulcerative colitis, thyroid disease, kidney cancer, and testicular cancer have a probable link to PFOA exposure.

63.     Other epidemiological studies of workers exposed to PFOA support the association between PFOA exposure and both kidney and testicular cancer, and also suggest associations with prostate cancer, ovarian cancer, non-Hodgkin's lymphoma, cervical cancer, breast cancer, multiple myeloma, and liver disease.

64.     In addition, scientific studies have concluded that PFOA adversely affects growth and development, reproduction and reproductive health, and the human immune and endocrine systems.

65.     The immunotoxicity of PFOA and related compounds has been demonstrated in a wide variety of species including humans.

66.     The available human and experimental evidence indicates that adverse effects on immune functions arise due to environmental exposure levels.

67.     Studies indicate that continued exposure to even low levels of PFOA in drinking water can result in adverse health effects.

68.     In 2009, EPA published provisional drinking water health advisories for PFOA.  The advisory for short-term exposure for PFOA was 400 ng/L (400 parts per trillion ["PPT"]).

69.     The provisional health advisory states that the discovery of PFOA in water above

9

the advisory level should result in the discontinued use of the water for drinking or cooking.

70.     EPA's 2009 provisional health advisory reflects the amount of PFOA that may cause adverse health effects in the short term (weeks to months).

71.     This health advisory is based on evidence that was available before 2008.  According to more recent studies, the 2009 EPA advisory levels appear to be approximately 1000 times too high.

72.     On May 19, 2016 EPA issued a new provisional health advisory for PFOA; in the new health advisory, EPA established an exposure limit of 70 parts per trillion ("ppt") in drinking water.

73.     In 2018, a report by the Agency for Toxic Substances and Disease Registry (the "ATSDR") concluded that the limit for PFOA in drinking water should be set at approximately 10 ppt.

## USE OF PFOA AT THE HOOSICK FACILITIES

74.     Dodge Fibers Corporation ("Dodge Fibers") purchased the Hoosick Facilities in or about 1961. Dodge Fibers subsequently changed its name to Dodge Industries. In or about 1966, Dodge Industries sold the Hoosick Facilities to O/E/N Acquisitions, Inc., which changed its name to Dodge Industries in or about 1967. Dodge Industries subsequently changed its name to Oak Materials Group, Inc. in or about 1975. Oak Materials Group, Inc. merged into Norplex/Oak Inc. in or about 1987, which then changed its name to Norplex Oak Inc. in or about 1989, and then became AlliedSignal Laminate Systems Inc.

75.     Allied-Signal Laminate Systems Inc. sold the Hoosick Facilities to Furon in or about 1996.

76.     Furon acquired the Fluorglas division of Allied-Signal in or about March of 1996, and through that acquisition obtained the Hoosick Facilities.

10

77.     Allied-Signal purchased Honeywell in or about 1999, and thereafter adopted the Honeywell name.

78.     In 1999, SGPP acquired Furon and the Hoosick Facilities

79.     Saint-Gobain and SGPP continue to use the Furon® brand name.

80.     SGPP remains the owner and operator of the Hoosick Facilities, with significant input from Saint-Gobain regarding operations.

81.     Upon information and belief, throughout the Oak Industries, Allied-Signal and Furon ownership of the Hoosick Facilities, each company manufactured stain and water-resistant fabric at the factory and/or performance plastic products.

82.     Throughout this period, upon information and belief, each company utilized PFOA-containing materials in the manufacturing of stain resistant fabric and/or performance plastic products.

83.     Upon information and belief, throughout the Oak Industries, Allied-Signal and Furon ownership of the Hoosick Facilities, each company used PFOA-containing materials as a part of its manufacturing process.

84.     Allied-Signal also made pressure-sensitive tapes, PTFE coated fabrics, and PTFE sheet, tape and laminates while it owned the Hoosick Facilities.

85.     SGPP continued to manufacture water and stain resistant fabric at the Hoosick Facilities utilizing PTFE dispersions, resins, and other formulations which contained PFOA.

86.     SGPP continued to use, store and dispose of PFOA, PFOA-containing materials and/or wastes containing PFOA at the Hoosick Facilities until 2016.

87.     Generally, SGPP's Hoosick Falls operation produces PTFE-film, adhesive tapes and silicone rubber for aeronautical, automotive, food processing and energy applications.

88.     Upon information and belief, Oak Industries, Allied-Signal, Furon and SGPP utilized large, approximately three-story ovens as a part of their manufacturing process.

89.     PTFE dispersions, resins, and other formulations which contained PFOA were used as part of the manufacturing process and was baked in the ovens on a daily basis.

90.     Upon information and belief, the use of the ovens produced a sticky residue that would adhere to the internal tubing or "stacks" within the oven, and PFOA comprised a part of that residue.

91.     Upon information and belief, each company established a rotation by which each oven and its stacks were cleaned on a regular basis.

92.     Facility employees routinely would wash, cleanse, or otherwise remove that chemical residues from the stacks in the parking lot or otherwise on the grounds of the Hoosick Facilities and thereby release PFOA-containing materials into the environment.

93.     In response to a DEC questionnaire in 2016, SGPP admitted to disposal of PFOA-containing wastes at the Hoosick Facilities in documents attested to or confirmed by Edward Canning, an employee of SGPP and/or Saint-Gobain.

94.     PFOA and related compounds were present in the emissions from the ovens and were discharged to the environment via the stacks.

95.     As a result of the emissions from the ovens and the stacks PFOA and related compounds were present in the air, soil, surface waters and groundwaters in and around the Village.

96.     As a consequence, the residents of the Village, including the Plaintiff herein, were exposed to PFOA and related substances through inhalation, ingestion, and other methods.

97.     Upon information and belief, the Facility Owners also discharged PFOA into the environment through other means that will be revealed through the discovery process.

## PFOA CONTAMINATION IN THE VILLAGE'S MUNICIPAL WATER SUPPLY

98.     Upon information and belief, PFOA-containing materials were provided by the PFOA Suppliers to the Facility Owners, since, at least, 1975, ending in or about 2015.

99.     Upon information and belief, the Facility Owners have used PFOA-containing products at the Hoosick Facilities continually between 1975 and 2015.

100.     Upon information and belief, at all times that PFOA-containing materials were used at the Hoosick Facilities, PFOA was released and/or dispersed into the environment as a result of their use.

101.     Upon information and belief, the Facility Owners' behaviors, which facilitated the release and/or dispersal of PFOA into the environment in the Village, were the result of the intended and/or foreseeable uses of the PFOA-containing materials provided by the PFOA Suppliers.

102.     Upon information and belief, the various methods of release or dispersal of PFOA into the environment resulted in PFOA contamination of the air, soil, and surface and ground waters within the Village.

103.     The Village has a population of approximately 3,500 individuals.

104.     The Village operates and maintains a municipal water system.

105.     The Village's municipal water system has approximately 1,300 service connections. Most of the Village's 3500 inhabitants receive their water through the Village's municipal water system.

106.     The Village's water supply wells and the aquifer from which the wells draw water are located in close proximity to the McCaffrey Street Facility

107.     The McCaffrey Street Facility is located above the groundwater source from which the Village's wells draw.

108.     At all times relevant, the Village has operated and maintained a municipal water

system.

109.   SGPP and Saint-Gobain knew, or should have known, from the time they began their operations in the Village that there were serious health effects associated with PFOA.

110.   SGPP and Saint-Gobain knew, or should have known, that PFOA-containing materials had been used in the Hoosick Facilities and thereby posed a risk to those exposed to PFOA contamination originating from the Hoosick Facilities during the time of their ownership.

111.   Honeywell knew, or should have known, that PFOA-containing materials had been used in the Hoosick Facilities and thereby posed a risk to those exposed to PFOA contamination originating from the Hoosick Facilities during the time of their ownership.

112.   At no time prior to 2014 did the Facility Owners inform or advise the Village that PFOA contamination from the Hoosick Facilities posed a threat or a significant risk of injury to human health or the environment, despite their knowledge that PFOA exposure was harmful to humans.

113.   Samples taken from the Village water supply in October 2014 and reported in December 2014 revealed PFOA concentrations ranging from 170 ng/L up to 540 ng/L; the sample results revealed a PFOA concentration of 440 ng/L in treated or finished water that was being distributed to the users of the Village water system.

114.   Groundwater sampling at the McCaffrey Street Facility conducted in September and October 2015 showed PFOA concentrations as high as 18,000 ppt.

115.   Upon information and belief, those concentrations have continued to increase as PFOA continues to migrate from the soil into the groundwater below the Village.

116.   On December 30, 2014, SGPP filed a Toxic Substances Control Act ("TSCA") Section 8(e) Notice with EPA.  In that Notice, SGPP and Saint-Gobain reported the presence of PFOA in the Village water supply and the nexus of that contamination to the Hoosick Facilities.

14

117.    Additional samples were taken from the Village water system in February 2015. Analysis of those samples revealed PFOA at a concentration of 480 ng/L in "Finished Water." Testing of samples from individual wells revealed PFOA concentrations ranging from 150 PPT up to 490 PPT.

118.    Further sampling of the Village water system was undertaken in June, 2015. Analysis of samples taken in June revealed a PFOA concentration of 620 PPT in "Village Well #7." A sample taken from the "Village WTP Clearwell" produced a concentration of 662 PPT.  A sample taken from the "tap" at "TruValue" at 21953 Route 22, Hoosick Falls, produced a concentration of 612 PPT, and a sample taken from a "bathroom sink cold tap" at a residence at 44 Abbot Street, Hoosick Falls, revealed a concentration of 618 PPT.

119.    Village residents did not know and had no reason to know they were, and had been, consuming hazardous levels of PFOA from their municipal water supply for years, if not decades.

120.    SGPP and Honeywell are, and were, aware of their responsibility for the contamination of the Hoosick Falls water supply.

121.    As reflected in SGPP's TSCA Section 8(e) Notice to EPA, the Hoosick Facilities are the sources of the PFOA contamination detected in the Village's municipal water system.

**STATUTE OF LIMITATIONS**

122.    The Statute of Limitations for personal injury claims in the State of New York is set forth in Section 214 of the Civil Practice Law and Rules (the "CPLR").

123.    CPLR §214-c sets forth a three-year Statute of Limitations for personal injury claims, with the three-year period running from the earlier of either the date of discovery of the injury, or the date at which the injury should have been discovered with reasonable diligence.  Where the discovery of the cause of the injury is unknown at the date of the injury, but is discovered within five years thereof, there is a provision which extends the statute of limitations to five years from the time the

injury was or should have been discovered, so long as the claim is brought within one year of the discovery of the cause of the injury.

124.     CPLR §214-f came into effect on July 21, 2016, and pertains specifically to personal injuries caused by contact with or exposure to any substance or combination of substances found within an area designated as a Superfund site.  Section 214-f enables a plaintiff in a toxic exposure case to bring an action per the terms of §214-c, or within three years from the date of the designation of the area of exposure as a state Superfund site or a federal Superfund site, whichever is latest.

125.     The Hoosick Facilities were designated as a Superfund Site by the New York State Department of Environmental Conservation on or about February 16, 2016.

126.     The Hoosick Facilities were designated as Federal Superfund sites on August 3, 2017.

## PLAINTIFF'S EXPOSURE AND INJURIES

127.     Plaintiff Ryan Slowey moved to Hoosick Falls in 1986 at the age of 6.

128.     At that time, he moved into a house within the Village which utilized municipal water.

129.     Mr. Slowey lived in the Village for approximately 14 years until 2000.

130.     Mr. Slowey and his family utilized the municipal water every day for, among other things, cooking, drinking and bathing.

131.     Beginning in approximately August, 2007, Mr. Slowey began to experience acute pains in his groin.

132.     Over the next few months, Mr. Slowey continued to experience more and more instances of acute groin pain.

133.     On October 3, 2009, on his 27th birthday, Mr. Slowey was diagnosed with non-seminoma testicular cancer.

134.     Mr. Slowey underwent an orchiectomy on October 9, 2009 to remove one of his testicles.

135.   The pathology report revealed that Mr. Slowey's cancer was designated as Stage 1B.

136.   On December 11, 2009, Mr. Slowey underwent a retroperitoneal lymph node dissection ("RPLND") at Memorial Sloan Kettering Cancer Center ("Sloan Kettering") in Manhattan to remove abdominal lymph nodes.

137.   The RPLND is an in-patient procedure which involves making an incision from the sternum to the waist, separating the abdominal muscles, and removing 65-80 lymph nodes.

138.   The RPLND carries a high risk of retrograde ejaculation, which often results in infertility.

139.   Mr. Slowey's RPLND took nearly seven hours and resulted in a seven-day hospital stay at Sloan Kettering.

140.   The RPLND resulted in the discovery and removal of two 1-centimeter tumors in Mr. Slowey's lymph nodes.

141.   After his surgery, Mr. Slowey was unable to work for several months; and lost more than 20 pounds.

142.   Mr. Slowey experienced acute pain for at least four months following his surgery.

143.   For several years following his surgery, Mr. Slowey underwent frequent bloodwork and CT scans of his abdomen.

144.   Mr. Slowey's has experienced severe digestive problems since his surgery.

145.   Mr. Slowey has experienced trouble sleeping since his surgery.

146.   As a result of his cancer, Mr. Slowey has and continues to experience great anxiety regarding his health.

147.   As a result of his cancer and ongoing health risks and concerns, Mr. Slowey has incurred extensive medical costs, and been forced to miss many days of work.

148.   Mr. Slowey's testicular cancer arose directly from and was caused by exposure to

PFOA; and Defendants are directly responsible for the PFOA in the local environment, including the aquifer and, accordingly, the drinking water which Mr. Slowey consumed.

149.    As a direct and proximate result of Defendants' acts and omissions, particularly the aforementioned PFOA contamination of the Village's water supply, Plaintiff was exposed to PFOA.

150.    As a result of Plaintiff's exposure to PFOA caused by Defendants, Plaintiff has a clinically demonstrable presence of PFOA in Plaintiff's body and/or an illness, disease or condition associated with exposure to PFOA.

151.    As a result of Plaintiff's exposure to PFOA caused by defendants, Plaintiff is at an increased risk of adverse health effects associated with such exposure.

152.    But for the Defendants' contamination of the local environment in Hoosick Falls with PFOA, Mr. Slowey would not have had testicular cancer, would not have the constant fear of a relapse, and would not have experienced the myriad other ongoing health effects and concerns stated above.

153.    Plaintiff has suffered personal injuries and economic loss as a result of Defendants' tortious and wrongful acts.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE AND GROSS NEGLIGENCE)
**Against All Defendants**

154.    Plaintiff repeats and realleges each of the foregoing allegations and statements as if fully set forth herein.

155.    At the relevant times specified above, the Facility Owners owned and operated the Hoosick Facilities that utilized PFOA-containing materials.

156.    At all relevant times, the PFOA Manufacturers developed, tested, selected, manufactured, assembled, inspected, packaged, marketed, distributed and sold PFOA-containing materials to the Facility Owners.

157.     Defendants owed Plaintiff a duty to use reasonable care in the development, testing, selection, manufacture, assembly, inspection, packaging, marketing, distribution, sale, use, handling, storage and/or disposal of PFOA and PFOA-containing products.

158.     The Defendants owed a duty of care to Plaintiff that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic and bio-accumulative nature of PFOA.

159.     Defendants owed a duty not to pollute Plaintiff's drinking water supply.

160.     At all relevant times, it was reasonably foreseeable that PFOA used at the Hoosick Facilities and released into the environment, including the air, soil, surface waters, and groundwaters, would migrate into the drinking water supply in and around the Village.

161.     Defendants' failure to adequately warn, disclose, instruct, manage, inspect, handle and/or oversee the use, handling, storage, disposal and discharge of PFOA, and/or PFOA-containing materials, and in particular to prevent a massive release of PFOA into the environment, and subsequent failure to contain that release, amounts to an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to others.

162.     Defendants knew or should have known that the haphazard and indiscriminate discharge of PFOA and PFOA-containing materials into the environment posed a threat of significant danger to the environment and to the health and well-being of the nearby community and residents of the Village, including Plaintiff.

163.     With their superior knowledge, Defendants had a duty to disclose and warn which they violated.

164.     As a direct and proximate result of Defendants' negligent, reckless and/or willful acts and omissions alleged herein, PFOA was discharged into the air, soil, surface waters, and

groundwaters, in and around the Village, and into the municipal drinking water supply, which has become contaminated with unsafe levels of PFOA.

165.    Defendants by their acts and omissions breached their duty of care to Plaintiff.

166.    At all relevant times herein, Defendants each and collectively breached their duty of care to Plaintiff and were negligent, grossly negligent, willful, wanton, reckless and careless in, among other things, one or more of the following:

a.  Defendants knew or should have known, or consciously disregarded, the hazards of PFOA, the hazards associated with improper distribution, use, handling, storage and/or disposal of PFOA and/or PFOA-containing materials, and the effect of such improper distribution, use, handling, storage and/or disposal of PFOA and/or PFOA-containing materials on Plaintiff.

b.  Defendants knew or should have known, or consciously disregarded, that the use, handling, storage, disposal and discharge of PFOA and/or PFOA-containing materials was potentially hazardous to human health and the environment.

c.  Defendants knew or should have known, or consciously disregarded, the danger that PFOA posed to drinking water supplies.

d.  Defendants knew or should have known, or consciously disregarded, that their manner of the manufacturing, marketing, selling, distributing, use, storage and/or disposal of PFOA and/or PFOA-containing products would result in the contamination of the environment, including the air, ground and drinking water supplies.

e.  Defendants knew or should have known, or consciously disregarded, that PFOA bioaccumulates in blood serum.

f.  Defendants consciously and deliberately released PFOA and PFOA-containing materials into the environment by their improper distribution, use, storage and/or disposal of PFOA and PFOA-containing materials.

g.  Defendants consciously and deliberately allowed PFOA and PFOA-containing materials to be released from the Hoosick Facilities with full understanding of the dangers and consequences to nearby residents, including Plaintiff.

h.  Defendants failed to implement effective quality control procedures to ensure that PFOA was used and disposed of in a safe manner.

i.  The Facility Owners' manufacturing processes failed to use due care in the use, handling and disposal of PFOA and PFOA-containing materials.

j.  The Facility Owner Defendants knew, should have known, or consciously disregarded, that it was unsafe and/or unreasonably dangerous to wash out and/or discharge filters or trays containing PFOA and/or residue containing PFOA onto the ground within floor drains in, and in close proximity to, the Hoosick Facilities and in close proximity to the Village's water supply wells.

k.  The Facility Owner Defendants knew, should have known, or consciously disregarded, that it was unsafe and/or unreasonably dangerous to wash out and/or discharge into the environment the residue from the manufacturing ovens and their stacks.

l.  The PFOA Supplier Defendants failed to provide adequate warnings and instructions to prevent the discharge of PFOA into the environment, specifically the air, ground, and ground water in and around the Village.

m.  The PFOA Supplier Defendants concealed the dangers of PFOA, including the toxicity and adverse health risks associated with exposure to PFOA.

n.  Defendants consciously and deliberately wrongfully denied that PFOA was toxic or a substantial risk to human health.

o.  Defendants failed to exercise ordinary care and take adequate safety precautions to ensure that PFOA was effectively contained and not released into the surrounding environment, including the groundwater.

p.  Defendants consciously and recklessly failed to monitor PFOA discharge and release from their respective facilities.

q.  Defendants, once the release of PFOA into the environment was discovered, failed to immediately and diligently investigate and address PFOA disposal methods in order to stop the release and/or spread of the contaminant.

r.  Defendants failed to exercise ordinary care and take adequate safety precautions to ensure that PFOA did not unreasonably endanger the air and drinking water supply relied upon by residents of the Village and the surrounding area.

s.  Defendants, in conscious disregard of the rights of local residents, including Plaintiff, failed to warn of the release of PFOA into the air, ground and drinking water supply of the Village and the surrounding area.

t.  Upon information and belief, Defendants concealed from the public and Plaintiff the dangers posed by their improper use of PFOA and the release of PFOA into the environment.

167.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has been injured, and such injury was foreseeable. The aforementioned conduct by Defendants constitutes gross negligence, recklessness and/or wantonness which has been and continues to be a direct and proximate cause and/or contributing cause of the injuries and damages sustained by Plaintiff.

168.     The acts and omissions of Defendants have been intentional, willful, wanton, illegal, and done with conscious and deliberate disregard for the rights of Plaintiff, the health and safety of Plaintiff, and, as a result of these acts of Defendants, Plaintiff is entitled to punitive damages

169.     As a direct and proximate result of Defendants' actions and omissions described herein, Plaintiff has suffered and continues to suffer serious and disabling personal injuries, including testicular cancer, digestive issues, anxiety, and the constant risk and fear of contracting cancer and further adverse health effects.

170.     As a proximate result of Defendants' negligence, Plaintiff suffered and it is reasonably certain that Plaintiff will continue to incur in the future, general and special, incidental and consequential damages, including, but not limited to both past and future damages for: medical, hospital, nursing, pharmaceutical and medical related expenses; medical monitoring; travel and travel-related expenses; lost wages; lost household services; loss of enjoyment of life; emotional distress; fear of developing cancer and other disease; and other ordinary, incidental and consequential damages as would be anticipated to arise under the circumstances.

171.     As a result of the above acts and omissions, Defendants are liable to Plaintiff for the injuries and damages sustained as a result thereof, together with punitive damages and medical monitoring, in an amount to be determined by the trier of fact, without diminution by any comparative fault on the part of Plaintiff.

172.     This cause of action falls into one or more of the exceptions set forth in CPLR §1602.

## SECOND CAUSE OF ACTION
## (STRICT LIABILITY)
### Against the Facility Owner Defendants

173.    Plaintiff repeats and realleges each of the foregoing allegations and statements as if fully set forth herein.

174.    The Facility Owner Defendants Honeywell, SGPP and Saint-Gobain's use, handling, storage, disposal and discharge of PFOA and/or PFOA-containing materials at the Hoosick Facilities constitute an abnormally dangerous, ultra-hazardous and/or inherently or intrinsically dangerous activity for which Defendants are strictly liable to Plaintiff under common law.

175.    At all relevant times, the Facility Owners manufactured, marketed, distributed, sold and/or placed into the stream of commerce PFOA and/or PFOA-containing materials that contaminated the Plaintiff's drinking water supply.

176.    At all relevant times, the Facility Owner Defendant knew or should have known, and it was reasonably foreseeable, that PFOA used at the Hoosick Facilities during the manufacturing process was being released into environment, including the air, ground and drinking water supply of the Village and surrounding area.

177.    At all relevant times, the Facility Owners failed to warn the public, including Plaintiff, of the release of PFOA into the environment, including air, ground and drinking water supply of the Village and the surrounding area.

178.    At all relevant times, Defendants Honeywell, SGPP and Saint-Gobain failed to warn the public, including Plaintiff, of the dangers and health risks of PFOA exposure, including ingestion of drinking water contaminated by PFOA.

179.    As a direct and proximate result of the Facility Owners' acts and omissions, Plaintiff's drinking water supply was contaminated with PFOA.

180.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered serious and disabling personal injuries, and such injuries were foreseeable.

181.    As a proximate result of Defendants' negligence, Plaintiff suffered and it is reasonably certain that Plaintiff will continue to incur in the future, general and special, incidental and consequential damages, including, but not limited to both past and future damages for: medical, hospital, nursing, pharmaceutical and medical related expenses; medical monitoring; travel and travel-related expenses; lost wages; lost household services; loss of enjoyment of life; emotional distress; fear of developing cancer and other disease; and other ordinary, incidental and consequential damages as would be anticipated to arise under the circumstances.

182.    As a result of the above acts and omissions, Defendants are liable to Plaintiff for the injuries and damages sustained as a result thereof, together with punitive damages and medical monitoring, in an amount to be determined by the trier of fact, without diminution by any comparative fault on the part of Plaintiff.

183.    This cause of action falls into one or more of the exceptions set forth in CPLR §1602.

## THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY)
### Against the PFOA Supplier Defendants

184.    Plaintiff repeats and realleges each of the foregoing allegations and statements as if fully set forth herein.

185.    The PFOA Supplier Defendants DuPont, Chemours and 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed and/or supplied PFOA-containing materials for sale and sold such products to the Facility Owners in the ordinary course of their business.

186.    Upon information and belief, the Facility Owners utilized the PFOA-containing materials supplied by the PFOA Suppliers in a reasonably foreseeable and intended manner and for such products' intended uses.

187.    The PFOA-containing materials sold by the PFOA Suppliers were unreasonably dangerous to the residents of the Village, including Plaintiff, without adequate warnings and instructions to prevent discharge of PFOA into the environment, specifically the air, ground, and ground water in and around the Village, and accumulation inside the bodies of residents of the Village.

188.    The PFOA Suppliers knew or should have known that the PFOA-containing materials that they sold to Defendants Honeywell, SGPP, and Saint-Gobain would be discharged into the environment, contaminating the water supply of the Village, and accumulating in the blood serum of residents living within the Village, including Plaintiff.

189.    Defendants DuPont, Chemours, and 3M had actual knowledge of the health hazards associated with PFOA exposure through both animal studies conducted by researchers employed or contracted by such Defendants and through experience with each of their own workers, but, upon information and belief, failed to communicate such information to relevant governmental agencies, or to foreseeable users of the materials, including employees handling and disposing of them at the Hoosick Facilities.

190.    Defendants DuPont, Chemours, and 3M acted with reckless indifference to the health and safety of workers using their PFOA-containing materials and residents in communities where their PFOA-containing materials were used by failing to provide adequate warnings of the known dangers of PFOA when discharged into the environment, where those nearby, such as Plaintiff, are exposed to and/or ingest PFOA.

191.    As a direct and proximate result of Defendants DuPont, Chemours, and 3M's acts and omissions, Plaintiff suffered serious and disabling personal injuries, and such injuries were foreseeable.

192.    As a proximate result of Defendants' negligence, Plaintiff suffered and it is reasonably certain that Plaintiff will continue to incur in the future, general and special, incidental and consequential damages, including, but not limited to both past and future damages for: medical, hospital, nursing, pharmaceutical and medical related expenses; medical monitoring; travel and travel-related expenses; lost wages; lost household services; loss of enjoyment of life; emotional distress; fear of developing cancer and other disease; and other ordinary, incidental and consequential damages as would be anticipated to arise under the circumstances.

193.    As a result of the above acts and omissions, Defendants DuPont, Chemours, and 3M's are liable to Plaintiff for the injuries and damages sustained as a result thereof, together with punitive damages and medical monitoring, in an amount to be determined by the trier of fact, without diminution by any comparative fault on the part of Plaintiff.

194.    This cause of action falls into one or more of the exceptions set forth in CPLR §1602.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount that exceeds the jurisdictional limits of all lower courts that might otherwise have jurisdiction as follows:

1.    Actual, general, special, incidental, statutory, compensatory, and consequential damages in an amount to be proven at trial, but no less than $10,000,000.00, including compensatory damages for:

      a.    The pain and suffering caused by the personal injuries detailed above;

      b.    Medical costs and expenses incurred in the personal injuries detailed above;

    c.      The costs of medical monitoring reasonably certain and medically necessary due to exposure to the PFOA;

    d.      Increased risk of future disease or illness;

    e.      Emotional distress and mental anguish;

    f.      Fear of future disease or illness, including cancer.

2.      Punitive and exemplary damages due to Defendants' malice detailed above;

3.      All costs including reasonable attorneys' fees, court costs, and other litigation expenses;

4.      Pre and post-judgment interest; and

5.      All such other and further relief as to the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure §38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: February ___, 2019          Respectfully submitted,
       Albany, New York

                                  _____
                                    David A. Engel, Bar Roll Number 105288
                                    Nolan & Heller, LLP
                                    *Attorneys for Plaintiff*
                                    39 North Pearl Street, 3rd Floor
                                    Albany, New York 12207
                                    (518) 449-330